1 2

United States District Court
Southern District of Texas
FILED

APR 0 5 2002

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

MARIA T. COOKE, individually and   *
as representative of the Estate of   *
CHESTER J. COOKE, deceased,   *
and ROSANNA CHAMPION as   *
next friend of GLENN ALEXANDER   *
COOKE, a minor   *
  *   CIVIL ACTION NO. B-01-188
VS.   *
  *
THE UNITED STATES OF   *
AMERICA   *

## PLAINTIFFS' RESPONSE TO THE UNITED STATES' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO CONTINUE HEARING ON UNITED STATES' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, PLAINTIFFS in the above-entitled and numbered cause and file this their response to the United States' Motion to Dismiss or, in the Alternative, Motion to Continue the hearing on the United States' Motion for Summary Judgment, and in support thereof would respectfully show as follows:

1.

The government has moved to dismiss Plaintiffs' claims per Rule 12(b)(1) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment. In ruling on such a motion to dismiss the court

must take Plaintiffs' allegations as true and view them in a light most favorable to plaintiffs. *F.D.I.C. v. Nathan*, 804 F. Supp. 888 (S.D. Tex. 1992). The motion must be denied unless the court finds beyond all doubt that plaintiffs can not prove any facts to support their claims for relief. Id.

2.

Plaintiffs have alleged that the Immigration and Naturalization Service (I.N.S.) was negligent in enforcing its rules regarding safe use, carrying and storage of deadly weapons it issued to its employees. Plaintiffs firmly believe that had the pistol in question been locked away (as it was supposed to be) John Paul Garza would not have had the means to kill Glen Cooke on April 18, 1998. Certainly the I.N.S. cannot deny that an improperly secured, loaded pistol posses a foreseeable risk that someone is going to get seriously hurt, either by accident or design.

3.

Cases like this, brought under the Federal Torts Claims Act, are controlled by the law of the state where the loss occurred. Here, of course, it is Texas. *Transco Leasing Corp. v. U.S.* 896 F2d 1435, 1450 (5th Cir. 1990). Plaintiffs have alleged in their complaint that the

government is liable under both a respondeat superior theory, or based solely on Pablo Garza's negligence, and upon his supervisors' negligence for failing to properly supervise, or negligently entrusting, the weapon to Pablo Garza. Broadly the legal issue in this case is the extent to which the law places responsibility on a person or entity which gives another a deadly weapon. The government denies that it had a duty to Plaintiffs' decedent. Specifically the government denies it had a duty to control its detention officer, Pablo Garza, while he was outside the scope of his employment, and that any negligence on the part of the government, was not a proximate cause of Glen Cooke's death. The proximate cause issue will be addressed later.

### 4.

When analyzing whether a person or entity is responsible for the conduct of another the Texas courts look to the existence *vel non* of control. *Greater Houston Transport Co. v. Phillips*, 801 S.W.2d 523, 525-526 (Tex. 1990). A duty of control arises in special relationships such as the employer-employee relationship. Id. Texas cases have held that the duty to control an employee may be imposed on an employer even when the employee is acting outside the course and scope of his employment.

*Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307 (Tex. 1983).

### 5.

The I.N.S. has many rules which control its detention officers' behavior when they are outside of their official capacity. I.N.S. rules specifically state that "[c]arrying of a firearm while not in official capacity is prohibited."[1]  Failure to comply with this prohibition subjects the employee to reprimand or termination.[2]  The I.N.S.'s control of its employees' off-duty behavior is not limited to the handling and use of deadly weapons.  According to the OFFICER'S HANDBOOK, a detention officers's conduct may subject the employee to discipline.  I.N.S. officers are expected to obey the laws and "to behave themselves in such a manner that their conduct will be above reproach."

> "Elements of personal conduct on and off-duty which might affect your performance of duty or the functioning of the service are, of course, subject to Service regulation."[3]

The Officers' Handbook goes on to regulate conduct such as attending to personal obligations or indebtedness, not entering "places

---

[1] Exhibit 1 - Control, Usage and Handling of Firearms and Devices.

[2] Exhibit 2 - Affidavit of Eduardo Payan.

[3] Exhibit 3 - Officer's Handbook.

held in dispute" or habitually being in the company of "questionable characters." Officers should never drink in a saloon while in uniform "even at the end of the day's work." In short the I.N.S. continues to control its officer's behavior well after work has ceased. Such conduct is "subject to Service regulation."

6.

Therefore, in viewing the allegations in a light most favorable to Plaintiffs, the I.N.S. has the power to control, ergo, the legal duty to reasonably control, the manner and means by which Pablo Garza handled, carried and stored the I.N.S.-issued weapon. Certainly the naked fact of giving an employee a weapon augments the employer's duty to see that it is handled, carried and stored safely. It is the power to control which justifies respondeat superior liability.

7.

Under Texas law liability for a third-party's acts or omissions may also occur outside of a "special relationship." The existence of a duty is determined by considering several, interrelated factors - - - the risk, foreseeability, and likelihood of injury - - - which are weighed against the social utility of the actor's conduct, the magnitude of the burden of

guarding against the injury, and the consequence of placing the burden on the defendant. *Greater Houston Transp. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Of all these factors, foreseeability of the risk is "foremost and dominant consideration." *El Chico Corp. v Poole*, 732 S.W.2d 306, 311 (Tex. 1987).

8.

Applying these considerations to the facts at bar, it is reasonable to expect I.N.S. supervisors to supervise detention officers' use, carrying and storage of government issued guns after officers leave government property or have completed their hours of duty. The government's complete focus on whether Pablo Garza was or was not in the course and scope of his employment when the killing occurred is misplaced. Again, Texas courts do not require that an employee be in the course and scope of his employment for his employer to be liable under a negligent failure to supervise theory of recovery. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 868 S.W.2d 942, 950 (Tex. 1994) and *Dieter v. Baker Service Tools*, 739 S.W.2d 405, 408 (Tex. App. - Corpus Christi 1987 writ denied). Plaintiffs' negligent supervision claim is not focused on the behavior of Pablo Garza, but on the negligence of his supervisor, who in

essence gave him the gun and never saw that he was following important rules.

## 9.

At least one Texas court has properly opined that there is no independent cause of action for negligent supervision. Such claims should be analyzed as basic negligence claims. The elements of negligence are duty, breach of that duty and damages proximately caused by the breach. *Castillo v. Gared, Inc.*, 1 S.W.3d 781 (Tex. App. - Houston [1st Dist.] 1999). Therefore this court should apply the criteria used to determine duty under a negligence cause of action to determine whether the I.N.S. should be responsible for supervising the use, carrying and storage of its weapons by off-duty employees.

## 10.

Clearly weapons are inherently dangerous. It is beyond dispute that no one should give a child or lunatic a loaded pistol. The possibility of injury as a result of misuse of a gun is great. Though the exact circumstance under which an injury will occur may not be readily foreseeable, it is totally foreseeable, if a loaded gun is not properly used, carried or stored, that someone can be seriously injured. In short, the

likelihood and severity of an injury by an unsecured, loaded gun is foreseeable and great.

11.

Certainly I.N.S. detention officers should be allowed to carry pistols when transporting or guarding detainees.  Allowing them to take them home, however, is another thing.  According to Eduardo Payan, who worked for years at the Bayview Detention Center, the only reason officers would take a weapon home (instead of storing it in the arms storage area at the Bayview Detention Center) was so officers would have access to their weapons if called to emergency service.[4]  According to Mr. Payan, if the supervising officer for each shift had a key to the arms storage area, the weapons would always be available and there would be no need for detention officers to take weapons home.  In addition, issuance and deployment of gunlocks would have prevented Glen Cooke's death.  Even asking Pablo Garza whether he carried the government's gun in his vehicle while off-duty, and then warning him of the risk of reprimand or termination if he did, would have lessened the

---

[4] Exhibit 2 - Affidavit of Eduardo Payan.

likelihood that John Paul Garza would have had access to deadly force on the day in question.

### 12.

Requiring the I.N.S. to implement these measures would not be unduly burdensome nor hinder its performance.   After applying the criteria for determining legal duty, it seems clear that the foreseeable risk of substantial harm from failing to properly supervise the use, carrying and storage of government-issued weapons by off-duty officers outweighs the negligible burden and inconvenience occasioned by imposition of such a duty.

### 13.

Should the court believe that Plaintiffs must adduce evidence that the I.N.S. knew or should have known that Pablo Garza negligently used, carried or stored the weapon while off-duty, then Plaintiffs request the opportunity to conduct discovery before having to produce such evidence.   While Plaintiffs already have some knowledge that Pablo Garza was negligent by regularly carrying a loaded pistol in his vehicle, the extent of that recklessness and the I.N.S.' knowledge (constructive or actual), can not be discerned with out discovery, and specifically,

deposing Pablo Garza, his friends, associates, supervisors and studying his personnel file.

## 14.

Lastly the government claims that, even if it was negligent in supervising how Pablo Garza used, carried or stored the pistol, such negligence was not a proximate cause of the shooting which led to Glen Cooke's death.    Proximate cause consists of cause in fact and foreseeability.   Castillo v. Gared, 1 S.W.3d 781, 786 (Tex. App. - Houston [1st Dist.]1999).   The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred.   Id.   The evidence must show that the defendant's negligence was a substantial factor and not a remote cause.   Id.

## 15.

In this case the government provided a gun to a detention officer who, based on information and belief, was known to be of questionable character and routinely carried the pistol loaded in his vehicle against I.N.S. rule's.[5]   The mere act of allowing an employee to routinely drive

_____

[5] Exhibit 2 - Affidavit of Eduardo Payan.

around while off-duty with a loaded government-issued gun in his vehicle creates a dangerous condition.

## 16.

It is a fact that Glen Cooke died from gun-shot wounds inflicted by an I.N.S. pistol.[6] Whether the availability of the government's gun was a "substantial factor" or a "remote cause" in bringing about Glen Cooke's death is a question of fact and should not be the basis for dismissal without a substantial opportunity for discovery.   In any event, the gun did not merely furnish a condition that made the injury possible, it caused the injury.  In weighing the evidence in favor of the plaintiffs, the court should infer that the conflict between John Paul Garza and Glen Cooke would not have escalated to a life or death struggle without the presence of the government's pistol.

## 17.

Foreseeability, the second element of proximate cause, requires that a person of ordinary intelligence be able to anticipate the danger created by a negligent act or omission.  Here, a person of less than ordinary intelligence could anticipate that an easily accessible, loaded

---

[6] Exhibit 4 - Certificate of Death of Glen Cooke.

gun creates a very dangerous situation.  Such danger is the reason we have penal laws which provide for imprisonment for improper care and use of a firearm.  Because of the obvious and foreseeable danger, the I.N.S. prohibits its employees from carrying weapons while off-duty.

18.

WHEREFORE, Plaintiffs pray that the United States' Motion to Dismiss be denied or, in the alternative, that the court grant Plaintiffs a continuance of the summary judgment hearing until discovery may be conducted.

Respectfully submitted,

Barry R. Benton
284 Ebony Avenue
Brownsville, Texas  78520
Telephone (956) 546-9900
Facsimile (956) 546-9997
State Bar No. 02176500
Federal I.D. No. 3968
ATTORNEY IN CHARGE FOR
PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____5th_____ day of April, 2002, a true and correct copy of Plaintiffs' Response to the U.S. Motion to Dismiss or, in the Alternative, Motion for Continuance to U.S. Motion for Summary Judgment was mailed to attorney of record, to wit:

Mr. Stephen Handler
U.S. Department of Justice
FTCA Staff, Torts Branch
Civil Division
P.O. Box 888
Benjamin Franklin Station
Washington, DC 20044

BARRY R. BENTON

## CONTROL, USAGE AND HANDLING OF FIREARMS AND GAS DEVICES

**FIREARMS**
Generally, Detention Enforcement Officers shall not carry firearms.  If a DEO is assigned to duties which he regards as hazardous and feels it is necessary to carry a firearm, permission should be obtained from the Chief Detention Enforcement Officer.  Good judgement must be exercised by the Supervisory Officer and Detention Enforcement Officer in matters involving the carrying of a firearm while on official duty.  At no time should a weapon be worn indiscriminately when there is no probability that it might be needed.  Carrying of a firearm while not in official capacity is prohibited.

A Detention Enforcement Officer may receive authorization to carry personally owned weapons.  The personally-owned weapon must conform with Service Standards.  A DEO may receive such authorization from the District Director.  Also, all detention enforcement officers are required to meet sidearm qualifications as mandated on AM 4210.  Failure to meet the minimum qualification requirements may restrict the DEO's duties and responsibilities while in the performance of their official duties.

Firearms shall not be carried in foreign territory except at those places where officers are required to cross the border on an assigned duty and where such action is with the knowledge and consent of the authorities of the neighboring countries.

Detention Enforcement Officers whose mission requires carrying weapons aboard an aircraft shall notify as far in advance as airline representative, but in no case less than one hour before flight time.  Travel orders shall be made available which show, if possible, the general nature of the mission and state the need for the officer to be armed.  If a weapon is carried aboard a flight, the employee shall comply with the airline procedures, and act with utmost discretion to avoid giving cause for alarm to the air carrier's personnel or to other passengers.

A Detention Enforcement Officer shall never carry a firearm unless he has been trained in the proper handling and safe use, and is qualified in the use of the firearm.  Each officer is expected to maintain their weapon in a safe operating condition and to store it against unsafe handling or theft.

Officers must avoid any conduct involving firearms tending to give an unfavorable impression of the Service or individual. Unnecessary display of the firearm will not be tolerated.

A currently qualified officer may carry either a service-owned, or personally-owned weapon while on official duty.  The revolver must not be less than a .38 caliber with a 2" barrel or greater than a .357 magnum with a 4" barrel.  The trigger pull must not be less than 2 1/2 pounds.


EXHIBIT 1

All officers are expected to follow all firearm safety rules and precautions.

Firearm qualifications shall be conducted at the Port Isabel Service Processing Center Firing Range, under the close supervision of the range officer. All officers are expected to comply with all firing regulations.

A Detention Enforcement Officer should use a firearm only for self-defense, in defense of a fellow officer, or in the defense of an innocent third party.

In each incident involving the use of firearms a verbal report shall be made to the first-line supervisor as soon as time and circumstances permit, and within sixteen (16) hours of each incident the Detention Enforcement Officer(s) participating therein shall furnish a written report, through supervisory channels, to the Harlingen District Director. The first line supervisor shall submit all required reports of the matter when an officer is hospitalized or otherwise incapable of reporting. The District Director shall report the results of the Regional commissioner, through the Associate Commissioner, Enforcement.

Gun lockers shall be made available at the Port Isabel Service Processing Center when an officer is on duty and the use of a firearm is unnecessary.

At no time shall revolver or any other firearm, be permitted in the Detention area unless under extreme circumstances.

GAS DEVICES

The use of riot control gases are the most effective means of achieving the greatest temporary incapacitation of a riotous group with the least permanent injury. Gases may under favorable conditions saturate an entire area where gunfire count not penetrate.

Authority to order to use of gases is not delegated lower than the Chief Detention Enforcement Officer. The Supervisory Detention Enforcement Officer, Deportation Officer and the Assistant District Director for Deportation shall be notified immediately or any implementation of gaseous devices.

Gas devices along with riot equipment shall be stored securely until their use is required.

Strict accountability of all gas devices and riot gear must be maintained. Frequent periodic checks must be made of all gas devices to ensure that all outdated materials be replaced.

It is recommended that all officers review the Detention Officer Handbook, Chapter V, for further proper instructions in the usage of firearms and gas devices.

| | |
|---|---|
| SUBJECT: | Weapons Control |
| PURPOSE: | To ensure the safety and security of the facility and detainees. |
| POLICY: | No firearm, chemical agent or other weapons shall be worn or carried inside the perimeter of the facility unless it is during an emergency. |
| REFERENCE: | OI 103.1(c)(3), OI 287.15<br>AM 2820.12, AM 2897<br>IDO Handbook, Chapter III<br>M-68 Handbook |

PROCEDURES:   A.   Safeguards and Definitions *Service Processing Center*

Each SPC shall provide adequate safeguards for all security equipment. Security equipment is defined as firearms, ammunition, chemical agents, batons and helmets.

B.   Storage

Storage of security equipment will be in a secure vault or room outside of the detainee quarters and activity area. The storage area should be easily accessible to staff members for emergencies. Small amounts of selected security equipment may be maintained at the Control Post to facilitate accessibility.

C.   Issuance of Security Equipment

Security equipment must be accurately inventoried and recorded including expiration dates on chemical agents and ammunition.

D.   Inventory of Security Equipment

Security equipment must be accurately inventoried and recorded including expiration dates on chemical agents and ammunition.

E.   Pistols

1.   All officers required or designated to carry sidearms must be currently qualified in their use.

2.   Sidearms will not be worn when:

a.   In the opinion of the OIC or higher authority, the carrying of sidearms is inadvisable.

2. an accurate and precise description of the
   incident and reasons for employing force.

3. a description of the weapon, if any, and
   the manner in which it was used,

4. a description of the injuries suffered, if
   any, and the treatment given and/or
   received, and

5. a list of all participants and witnesses
   to the incident.


APPROVED BY _____

DATE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA T. COOKE, individually and | * | |
| as representative of the Estate of | * | |
| CHESTER J. COOKE, deceased, | * | |
| and ROSANNA CHAMPION as | * | |
| next friend of GLENN ALEXANDER | * | |
| COOKE, a minor | * | |
| | * | CIVIL ACTION NO. B-01-188 |
| VS. | * | |
| | * | |
| THE UNITED STATES OF | * | |
| AMERICA | * | |

## <u>AFFIDAVIT OF EDUARDO PAYAN</u>

BEFORE ME, the undersigned authority, this day personally appeared EDUARDO PAYAN, known to me to be the person whose name is subscribed below, and upon being duly sworn, deposed and said:

"My name is Eduardo Payan. I am over the age of eighteen, of sound mind and competent in all respects to make this affidavit. The facts stated herein, unless otherwise stated, are based on my personal knowledge.

"I was employed by the Immigration and Naturalization Service for 24 years. During that time I was responsible for training newly hired personnel at Glynco, Georgia. Part of my instruction responsibilities was teaching new employees the rules and regulations regarding safe use,



carrying and storage of weapons. As a former instructor, I am fairly knowledgeable of the I.N.S.' rules regarding the use, carrying and storage of government-issued weapons. Some of those relevant rules are attached as an exhibit to this affidavit. But the most important rule is that the I.N.S. prohibits dentention officers from carrying government-issued weapons while off-duty.

"I worked six years or from 1988 to 1994 at the I.N.S. Detention Center at Bayview, Texas. During that time detention officers were allowed to take government-issued weapons home so that they would have access to their weapons in the event they were called to emergency duty. This was necessary because only one employee had access to the weapons storage area and, if he was not working at any given time, the weapons may not be available to the detention officers when needed. This problem of access to weapons from the storage room could have easily been remedied by allowing the supervisor on duty for any given shift to have keys to the weapons storage area. This would have vitiated the need for detention officers to take weapons home after their shift or work was completed.

"At the time I worked at the Detention Center guns locks were

never issued to detention officers who took fire arms home after work. This would have provided substantial safety by preventing the misuse of government-issued weapons.

"Pablo Garza, a former detention officer whose son, John Paul Garza, shot and killed Glen Cooke, worked at the Bayview Detention Center during some of time that I worked there. Pablo Garza was notorious for having domestic disputes while off-duty which required I.N.S. intervention. Pablo Garza was also accused and indicted for stealing money from detainees, though those charges ultimately resulted in an acquittal. I would say that generally Pablo Garza's reputation for being a responsible detention officer was not good. It is my understanding that he was ultimately terminated from the Service.

"During the time that I worked at the Bayview Detention Center I never saw, knew or heard of any supervision or instruction of employees regarding use, carrying and storage of government-issued weapons while off-duty. I believe that had supervisors at the Detention Center been more conscientious in supervising and enforcing the rules regarding government issued weapons by off-duty employees that Pablo Garza, most likely, would not have had the loaded pistol in his unlocked car at

the time Glen Cooke was killed.

"Lastly, the I.N.S. routinely controlled the conduct of its employees while they were off-duty.  Even a cursory inspection of the Officer's Handbook, a copy of which is attached to this affidavit, reflects the various ways in which a detention officer could be disciplined if he failed to behave while off-duty in accordance with the I.N.S.' standards.  This control by the I.N.S. of the conduct of detention officers while off-duty was especially present when the employees, like Pablo Garza, lived at the Detention Center itself."

_____
EDUARDO PAYAN


SWORN TO AND SUBSCRIBED BEFORE ME on this _3rd_ day of _April_, 2002, to certify which witness my hand and seal of office.

SEAL:

Notary Public, State of Texas
Print Name _Leslie C. Delgado_
My Commission Expires: _12-10-02_

LESLIE C. DELGADO
MY COMMISSION EXPIRES
December 10, 2002


AFFIDAVIT OF EDUARDO PAYAN
PAGE 4

## CONTROL, USAGE AND HANDLING OF FIREARMS AND GAS DEVICES

### FIREARMS

Generally, Detention Enforcement Officers shall not carry firearms. If a DEO is assigned to duties which he regards as hazardous and feels it is necessary to carry a firearm, permission should be obtained from the Chief Detention Enforcement Officer. Good judgement must be exercised by the Supervisory Officer and Detention Enforcement Officer in matters involving the carrying of a firearm while on official duty. At no time should a weapon be worn indiscriminately when there is no probability that it might be needed. Carrying of a firearm while not in official capacity is prohibited.

A Detention Enforcement Officer may receive authorization to carry personally owned weapons. The personally-owned weapon must conform with Service Standards. A DEO may receive such authorization from the District Director. Also, all detention enforcement officers are required to meet sidearm qualifications as mandated on AM 4210. Failure to meet the minimum qualification requirements may restrict the DEO's duties and responsibilities while in the performance of their official duties.

Firearms shall not be carried in foreign territory except at those places where officers are required to cross the border on an assigned duty and where such action is with the knowledge and consent of the authorities of the neighboring countries.

Detention Enforcement Officers whose mission requires carrying weapons aboard an aircraft shall notify as far in advance a airline representative, but in no case less than one hour before flight time. Travel orders shall be made available which show, if possible, the general nature of the mission and state the need for the officer to be armed. If a weapon is carried aboard a flight, the employee shall comply with the airline procedures, and act with utmost discretion to avoid giving cause for alarm to the air carrier's personnel or to other passengers.

A Detention Enforcement Officer shall never carry a firearm unless he has been trained in the proper handling and safe use, and is qualified in the use of the firearm. Each officer is expected to maintain their weapon in a safe operating condition and to store it against unsafe handling or theft.

Officers must avoid any conduct involving firearms tending to give an unfavorable impression of the Service or individual. Unnecessary display of the firearm will not be tolerated.

A currently qualified officer may carry either a service-owned, or personally-owned weapon while on official duty. The revolver must not be less than a .38 caliber with a 2" barrel or greater than a .357 magnum with a 4" barrel. The trigger pull must not be less than 2 1/2 pounds.

All officers are expected to follow all firearm safety rules and precautions.

Firearm qualifications shall be conducted at the Port Isabel Service Processing Center Firing Range, under the close supervision of the range officer. All officers are expected to comply with all firing regulations.

A Detention Enforcement Officer should use a firearm only for self-defense, in defense of a fellow officer, or in the defense of an innocent third party.

In each incident involving the use of firearms a verbal report shall be made to the first-line supervisor as soon as time and circumstances permit, and within sixteen (16) hours of each incident the Detention Enforcement Officer(s) participating therein shall furnish a written report, through supervisory channels, to the Harlingen District Director. The first line supervisor shall submit all required reports of the matter when an officer is hospitalized or otherwise incapable of reporting. The District Director shall report the results of the Regional commissioner, through the Associate Commissioner, Enforcement.

Gun lockers shall be made available at the Port Isabel Service Processing Center when an officer is on duty and the use of a firearm is unnecessary.

At no time shall revolver or any other firearm, be permitted in the Detention area unless under extreme circumstances.

GAS DEVICES

The use of riot control gases are the most effective means of achieving the greatest temporary incapacitation of a riotous group with the least permanent injury. Gases may under favorable conditions saturate an entire area where gunfire count not penetrate.

Authority to order to use of gases is not delegated lower than the Chief Detention Enforcement Officer. The Supervisory Detention Enforcement Officer, Deportation Officer and the Assistant District Director for Deportation shall be notified immediately or any implementation of gaseous devices.

Gas devices along with riot equipment shall be stored securely until their use is required.

Strict accountability of all gas devices and riot gear must be maintained. Frequent periodic checks must be made of all gas devices to ensure that all outdated materials be replaced.

It is recommended that all officers review the Detention Officer Handbook, Chapter V, for further proper instructions in the usage of firearms and gas devices.

SUBJECT:        **Weapons Control**

PURPOSE:        To ensure the safety and security of the
                facility and detainees.

POLICY:         No firearm, chemical agent or other weapons
                shall be worn or carried inside the perimeter of
                the facility unless it is during an emergency.

REFERENCE:      OI 103.1(c)(3), OI 287.15
                AM 2820.12, AM 2697
                IDO Handbook, Chapter III
                M-68 Handbook

PROCEDURES:     A.    Safeguards and Definitions *Service Processing Center*

                      Each SPC shall provide adequate safeguards
                      for all security equipment. Security
                      equipment is defined as firearms, ammunition,
                      chemical agents, batons and helmets.

                B.    Storage

                      Storage of security equipment will be in a
                      secure vault or room outside of the detainee
                      quarters and activity area. The storage area
                      should be easily accessible to staff members
                      for emergencies. Small amounts of selected
                      security equipment may be maintained at the
                      Control Post to facilitate accessibility.

                C.    Issuance of Security Equipment

                      Security equipment must be accurately
                      inventoried and recorded including expiration
                      dates on chemical agents and ammunition.

                D.    Inventory of Security Equipment

                      Security equipment must be accurately
                      inventoried and recorded including expiration
                      dates on chemical agents and ammunition.

                E.    Pistols

                      1.    All officers required or designated
                            to carry sidearms must be currently
                            qualified in their use.

                      2.    Sidearms will not be worn when:

                            a.    In the opinion of the OIC or
                                  higher authority, the carrying
                                  of sidearms is inadvisable.

2. an accurate and precise description of the
   incident and reasons for employing force.

3. a description of the weapon, if any, and
   the manner in which it was used,

4. a description of the injuries suffered, if
   any, and the treatment given and/or
   received, and

5. a list of all participants and witnesses
   to the incident.

APPROVED BY _____

DATE _____

UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
WASHINGTON, D.C.

OFFICERS' HANDBOOK

A Guide for Proper Conduct
and Relationships With Aliens
and the General Public

M-68.
Rev. 1981N

# FOREWORD

The Immigration and Naturalization Service has a tradition of good public service. Everyone who is employed in our Service is, in a general sense, a representative of the Service. We are proud to be a part of it. This pride is reflected in the degree of efficiency with which we go about our daily work and in the courtesy and effectiveness with which we deal with each member of the public with whom we come into official contact, as well as with our associates in the Service.

It is our purpose in this handbook to set forth the more important guides to proper official conduct in order to reduce to an absolute minimum occurrences of misconduct or impropriety on the part of members of the Service in their dealings with the public.

It obviously is impracticable to attempt to gather in one small handbook all the laws, regulations and standards of conduct applicable to our daily contacts with the public and our associates while we are on duty. Everyone is presumed to know the law. Service regulations are, of course, readily available to all of us and should be frequently consulted. Civil Service regulations can be made available through supervisors or the various personnel offices of the Service.

Compliance with the rules set forth in the pages which follow, and the exercise of reasonably sound judgment, will assist you in the proper discharge of your official duties.

# PART I.—LAWS AND REGULATIONS

## GENERAL STATEMENT

A brief summary of Federal laws and Service regulations is presented in this part.

## USE OF ALCOHOL & DRUGS

As an employer, the Federal Government is concerned with the accomplishment of agency missions and the requisite need to maintain employee productivity. When an employee's use of drugs or alcohol interferes with the efficient and safe performance of his or her assigned duties, reduces his or her dependability or reflects discredit on the agency, Federal managers will take action in the form of (1) nondisciplinary procedures under which an employee with a drinking or drug problem is offered rehabilitative assistance, and (2) failing response which results in acceptable work performance, invoking regular disciplinary procedures for dealing with problem employees.

A full statement of agency policy regarding employee use of drugs or alcohol is found in DOJ Order 1792.1 on the Employee Assistance Program. In brief, the following is stated: (1) Alcoholism and drug abuse are recognized as treatable health problems; (2) the agency is not concerned with the employee's use of alcohol except as it may affect job performance or the efficiency of the service; (3) an agency will not condone employee drug activity which is contrary to law; (4) employees who suspect an alcoholism or drug abuse problem are encouraged to voluntarily seek counseling; and (5) the counseling assistance will be handled in a confidential manner.

## DISCLOSURE OF CONFIDENTIAL INFORMATION

Official business with this Service, so far as possible consistent with the limitations of available space, should be conducted in offices out of the hearing of other aliens and the general public. Discussions

among officers involving points of law should be confined to groups composed only of officers and employees of this Service, never before outsiders. Official matters should never be discussed with anyone outside the office except under proper authorization. Information contained in official files is strictly confidential and must be used only as authorized. Aliens under examination should not be informed of the source of confidential information nor should they be permitted to see the files or records of the Service except as provided under existing rules and regulations. If you are in doubt in any instance, consult your supervisor.

## ACCEPTANCE OF GRATUITIES

The acceptance of gratuities by officers of this Service or members of their families from any person or his agent who has any official matter before this Service is forbidden by Statute and by regulation. Acceptance of gratuities, however inconsequential, encourages requests for favors. It is easier to refuse an improper request when you are not obligated to the person who makes such a request. Refusal to accept gifts offered in good faith, however, must be done tactfully and courteously in order not to offend persons who offer such gratuities.

## CONFLICT OF INTEREST

Officers of this Service shall avoid involvement in any conflict of interest situation, i.e., one in which a private interest (usually of an economic nature) conflicts or raises a reasonable question of conflict with official duties and responsibilities. The potential conflict is of concern whether it is real or apparent.

## OUTSIDE EMPLOYMENT

An employee of this Service may not engage in any outside employment (including teaching, lecturing or writing), or in any business activity, without prior written approval. Authority will not be granted if the proposed employment or business activity might interfere with the employee's official duties, or involve or embarrass the Service in any way. Approval of such employment may be revoked at any time if circumstances warrant such action.

- 2 -

## ACTING AS AN ATTORNEY OR AGENT IN CLAIMS AGAINST THE UNITED STATES

No employee of the Immigration and Naturalization Service is permitted to act as an agent or attorney in prosecuting any claim against the United States by any means or manner other than in the discharge of his official duties, or to receive any gratuity or any share or interest in any claim from any claimant against the United States for any services rendered in the prosecution of such claim. No person who has been in the employ of this Service may take any action in the prosecution of any claim pending at the time he was an employee until he shall have been no longer connected with the government service for at least two years.

## FALSE CLAIMS AGAINST THE UNITED STATES

Severe penalties are provided by the United States criminal code for willfully making or presenting a false, fictitious or fraudulent claim for the purpose of defrauding the government. False or inaccurate statements as to travel performed, work done, or amounts expended are grounds for dismissal from the Service and possible criminal prosecution.

## FALSE STATEMENT OF AN OFFICER CONCERNING OATH TAKEN BEFORE HIM

Any officer of this Service authorized to administer oaths or to take and certify acknowledgements is liable to criminal prosecution for knowingly making any false acknowledgment, certificate, or statement concerning an appearance before him.

## CONSPIRACY

The United States Criminal Code provides very severe penalties, upon conviction, when two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose and one or more of the parties do any act to effect the object of the conspiracy.

- 3 -

CODE OF ETHICS FOR GOVERNMENT SERVICE

ANY PERSON IN GOVERNMENT SERVICE SHOULD:

PUT loyalty to the highest moral principles and to country above loyalty to persons, party, or Government department.

UPHOLD the Constitution, laws and legal regulations of the United States and all governments therein and never be a party to their evasion.

GIVE a full day's labor for a full day's pay; giving to the performance of his duties his earnest effort and best thought.

SEEK to find and employ more efficient and economical ways of getting tasks accomplished.

NEVER discriminate unfairly by the dispensing of special favors or privileges to anyone, whether for remuneration or not; and never accept, for himself or his family, favors or benefits under circumstances which might be construed by reasonable persons as influencing the performance of his governmental duties.

MAKE no private promises of any kind binding upon the duties of office, since a Government employee has no private word which can be binding of public duty.

ENGAGE in no business with Government, either directly or indirectly, which is inconsistent with the conscientious performance of his governmental duties.

NEVER use any information coming to him confidentially in the performance of governmental duties as a means of making private profit.

EXPOSE corruption wherever discovered.

UPHOLD these principles, ever conscious that public office is a public trust.

- 4 -

PART II.—SERVICE STANDARDS

GENERAL STATEMENT

The following Service standards have been designed to assist you in avoiding pitfalls which others have found to lead to embarrassment and other more serious consequences. They provide criteria for objective, self-analysis which will serve as a basis for constructive, planned self-improvement. Even though a violation of these standards may appear to be less serious than a violation of law or regulation, it is an important factor in appraising an officer's performance.

Most reprimands become necessary, not as a result of any lack of skill or knowledge of duties, but because of conditions which never would have occurred if reasonably good judgment had been exercised. Personality traits and general conduct both on and off duty are too often underestimated and neglected factors in success.

PROPER IDENTIFICATION

Officers must identify themselves properly when conducting official business. *In identifying themselves they should show their credentials and make it plain to those with whom they are dealing that they are members of the Immigration and Naturalization Service.* If reference is merely made to the Department of Justice they may be confused with representatives of other branches of the Department. All officers are cautioned that they are not to conduct themselves in any manner, by word or deed, so as to give the impression that they are connected with any other government agency.

NEEDLESS DISPLAY OF OFFICIAL MEANS OF IDENTIFICATION

Indiscriminate use of official certificates or official titles for other than official purposes or the needless display of firearms is not authorized and may serve as a basis for disciplinary action against the offender.

- 5 -

## LOSS OF OFFICIAL BADGES OR CREDENTIALS

You are charged with the responsibility of maintaining official identification credential in good condition, free from undue wear and mutilation. If you should lose your official badge, credentials or other government property with which you are charged, you shall immediately report the fact, in writing, to your official superior, stating the circumstances under which the loss occurred. If the facts reasonably establish that the loss occurred through negligence or carelessness, such disciplinary action will be taken as the facts and circumstances surrounding the loss may warrant. Failure to report such a loss may also result in disciplinary action.

## PROPER USE OF GOVERNMENT PROPERTY AND GOVERNMENT TIME

The utmost care should be exercised by officers of this Service in the use of automobiles or other Government property. Carrying unauthorized passengers in official automobiles is generally prohibited. The hours of duty specified is time to be devoted to Government business. Personal affairs must not be conducted on Government time. Unauthorized use of Government property may serve as a basis for disciplinary action.

## PROPER USE OF FIREARMS

Firearms shall be employed under the following conditions only: In self-defense, in defense of another officer, or in the defense of an innocent third party. Firearms shall not be used to fire into the air or alongside an alien who is attempting to escape. A misaimed bullet may mean manslaughter. The firing of warning shots in any manner is prohibited.

## RELATIONSHIPS WITH ALIENS

Aliens appear at Immigration and Naturalization Offices because they have problems. Those problems are real and important to them, no matter how insignificant they may appear to you. It is your duty to give them the same treatment you would like if your situations were reversed. An arrogant or unpleasant manner in official relationships will not be tolerated. Aliens are entitled to certain rights, among which is

-6-

the right to courteous, considerate treatment by officers of this Service. No remarks of a sarcastic or "kidding" nature should ever be made to an alien about his name, his nationality, his race, his religion, his economic condition, his dress, etc. Such remarks may result in disciplinary action against the employee involved. A pleasant conversational tone of voice should be used in speaking unless the person addressed is hard of hearing. A loud voice does not make a situation more clear to a person who has a poor command of English; rather, it may cause him to become confused.

Any association, business, social or otherwise, which may obligate, or appear to obligate, you to an alien in any way should be carefully avoided. Such obligation can become a serious barrier to the proper enforcement of the law and may bring criticism both to you and to the Service. You should never promise aliens immunity from deportation or prosecution for the purpose of obtaining information concerning other aliens or law violators. It is not good general practice to make promises of any kind to aliens, and certainly promises that cannot be fulfilled should not be made. Some practices which are not wrong in themselves should be avoided because of the improper impressions they create. For example: you should not authorize an alien to use your name as a business reference nor should you accept any kind of office, honorary or otherwise, in an organization whose membership is composed primarily of aliens and which might by implication place you in the position of being indebted to the group. You are likewise warned to avoid familiarity or personal relationships with aliens detained by the Service or who may possibly have business with the Service. Needless to say, "dates" should never be made with such aliens of the opposite sex.

Business dealings of any nature between you and an alien who is detained by this Service are forbidden. All dealings with alien merchants and other alien business people should be on a strictly business basis, and full value should be paid for goods received or services rendered. You should never buy property or personal effects from an alien who is under deportation proceedings or who has been excluded from admission to the United States. If, prior to your employment by this Service, you had business dealings with an alien who appears before you, the case should be referred to another officer.

-7-

## HUMANIZING IMMIGRATION AND NATURALIZATION LAWS

Immigration laws may appear to work hardship on aliens. You can humanize these laws while at the same time carry out the intent of Congress and the will of the people. You should always keep in mind that your decisions may spell future happiness or sorrow for those affected by your decisions. If it becomes necessary to detain or exclude an alien, even this can be done in a considerate manner. At a port of entry the Immigration Inspector is usually the first representative of our Government whom the alien meets. An unfavorable impression gained at this time will likely be a lasting one. We owe it to ourselves, the Service, and to our country to make this impression as favorable as possible. Deportation should be effected with as much consideration and humane treatment as possible. In such cases, under proper safeguards, the deportee should be permitted to say goodbye to his relatives and to collect the wages due him, and should be given any other reasonable assistance. He should be permitted to collect his personal belongings and to take them with him, no matter how trivial the articles may seem to you. Property which seems to have little utility may have subjective value that an officer may not realize. Adequate care must always be taken to insure that property held in custody of this Service is properly safeguarded against loss, theft, etc., and that it is delivered to the alien when he is deported from the United States, or released from custody.

## PREJUDICIAL INFLUENCE IN ADMINISTERING THE IMMIGRATION AND NATURALIZATION LAWS

Another abuse of authority of which no officer should ever be guilty is the use of unfair discrimination in the administration of the Immigration and Naturalization Laws. Any suggestion by an officer to an outsider or concerned persons that he can influence the decision in any case will be cause for disciplinary action. Certain rights and privileges to which aliens are entitled are provided by law. It is the duty of each officer individually to insure that these rights and privileges are administered with justice and equality. Discretionary action permitted under the Immigration and Naturalization Laws is intended to be nondiscriminatory. The intended purpose of such discretionary action is defeated if Service officers are guided by their own biases and prejudices. In all cases, care must be taken not to discriminate in favor of or against any alien or class of aliens.

## PREMATURE DECISIONS

You should take care to avoid giving inaccurate information to the public or to render opinions when not in possession of all of the facts. The premature expression of decisions is likely to prove a source of disappointment and embarrassment to all concerned and if wrong, may impel you to resort to undesirable face-saving devices. (Example: Advising an alien under deportation proceedings to dispose of household goods or personal effects in anticipation of possible deportation may prove embarrassing to you and cause needless difficulties to the alien should deportation not be ordered.) Premature decisions, whether verbally expressed or held in abeyance, are barriers to the unbiased investigation and consideration of evidence. A preconceived notion of guilt or innocence in any case introduces a conditioning and selective factor in the mind of the officer which may go far to preclude the true administration of justice. Inform aliens under proceedings as to decisions in their cases when all the facts are in, and after they have been duly considered, in such manner as to satisfy the aliens, if possible, that their cases have been decided only after fair consideration of all the available facts.

## SOLICITATION OF SERVICES

An alien who is detained or an alien or other person who has official business with the Service may ask you whether it is necessary or desirable to seek the services of an attorney or other representative. In no case should he be informed that he should not obtain an attorney. The person making such inquiry should be informed that he has the right to be represented at his own expense by an attorney in proceedings before the Service. However, he should also be informed that the determination whether he should obtain an attorney is one that he must make himself and that Service employees may not make such determination for him. If such a person states he would like to be represented by an attorney but that he cannot afford the expense involved, he may be referred to a voluntary social agency or a legal aid organization or a Bar Association.

Also you may be requested to suggest the name of an attorney or bonding company. A person requesting the name of an attorney should be referred to a Bar Association or to a telephone directory which lists

the names and addresses of attorneys. A person requesting the name of a bonding company should be referred to a telephone directory which lists the names of bonding companies. In no instance should a person be referred to a specific attorney or firm.

## DISCUSSION OF PERSONAL MATTERS WITH ALIENS

Discussion of matters personal to an alien or to an officer is out of order in official business relationships unless such personal matters are pertinent to the case. Such is usually a waste of time and frequently leads to objectionable discussion and consequent embarrassment.

## APPROVED TECHNIQUES FOR QUESTIONING ALIENS

An alien should always be fully informed of his rights. In the actual interrogation of the alien you should have a definite objective in mind and a purpose for every question. Such a procedure will save time, conserve energy, and inspire the respect of the alien and any other persons who may be present. Needless conversation wastes time, lessens respect for the officer, and may lead to serious antagonism and verbal controversy. Avoid following a routine line of questioning without taking into consideration the alien's age, intelligence, educational background and knowledge of the English language. As much privacy as possible should always be accorded an alien when he is being questioned in other than routine matters. It is poor procedure to question several offenders in the presence of each other. Avoid questioning of women on personal matters in the presence of others when it is likely to cause embarrassment, either to her or to anyone else present. When questioning a woman behind closed doors, a witness should be present for the protection of the officer, the Government, and the woman. When interrogating an alien, especially a woman, concerning apparent marital misconduct, nothing should be assumed beyond what the facts at hand reasonably well establish. Ground work should be carefully planned to make the questions appear justified to the person concerned. Questions on sordid subjects should be couched in non-offensive terms and phrased in such a way as to elicit the desired information. Such questions should not contain implications not supported by evidence. Before questioning an alien in such cases it is well to analyze carefully the facts and state the questions in such a manner that you yourself, if you were on the receiving end, would not be offended by their tenor.

## USE OF PHYSICAL FORCE AND "THIRD DEGREE METHODS"

The use of physical force or violence in handling detained aliens or other persons with whom official business is being conducted is permissible only in self-defense, in defense of another person, or to such an extent as is absolutely necessary in making an arrest or preventing an escape. The use of force and "third degree method" to obtain information and to force confessions will not be tolerated. Abuse of aliens is not permitted. There are times when aliens must be handcuffed, but in such cases the aliens should not be exposed to the public view any more than is necessary. Every effort should be made to spare an alien unnecessary embarrassment in his relations with the Service.

## ESCAPE OF AN ALIEN

Officers charged with the responsibility of escorting aliens in the custody of the Service are expected to take every reasonable precaution to prevent their escape. When an escape does occur a complete report should be made immediately thereafter. Appraisal of the facts and circumstances surrounding the escape will be made and disciplinary action taken when the facts justify it.

## RELATIONSHIPS WITH THE PUBLIC

The standing of the Immigration and Naturalization Service is largely dependent upon the service it renders, its effectiveness in enforcing the laws it is charged with administering and the general impression its employees make on the public. As an employee of the Government and the Immigration and Naturalization Service it is your duty to serve the public in a fair and impartial manner. We are dependent upon the law-abiding public for a constant flow of valuable information to assist us in the discharge of our functions. Officers of this Service must keep in mind that they are specialists; that what is their common knowledge to them is not equally known to all, and that it is their duty to endeavor to acquaint persons thoroughly with laws and regulations about which they inquire and to direct them to such other sources of information as they may request and to which they have a right. Every member of the public is entitled, as an absolute right, to courteous, fair, impartial, and sympathetic treatment from every employee of this Service.

## ADMINISTRATION OF OATHS

Where an oath is required, it should be administered in such a way as to impress the person taking it with its seriousness. It should never be administered in a perfunctory manner. Oaths should never be administered over the telephone, or to a person while he is seated.

## POISE AND DIGNITY IN PERFORMANCE OF OFFICIAL DUTIES

The importance of poise, dignity, sympathy, honest simplicity, and self-control even under the most severe provocation cannot be over-emphasized. The technique of reversing the situation to determine how it looks from the other man's point of view should be used extensively. An officer should be sure of himself but should never try to unduly impress others with his knowledge. He should be businesslike and considerate but never condescending or officious in this demeanor. He should cultivate the use of good English. He should never use profanity or vulgarity.

## COURTESY

The Service takes the realistic view that courtesy is necessary in our activities and is almost as much a job requirement as any other. It is your duty to be considerate and polite to the public at all times.

## BE PATIENT

It is often difficult to be patient and to exercise self-restraint in the face of verbal criticism or threatened physical violence, but such restraint and patience usually will enlist the support of witnesses and pay dividends in increased respect for the individual and the Service. Officers of this Service have the difficult problem of dealing with persons of a wide range of intelligence, mood, temperament and cultural backgrounds. No matter how exasperating the circumstances become, you must bear in mind that you are a representative of our Government and you must conduct yourself in a worthy manner.

## BE FIRM

There always are people who will insist on special favors and privileges not accorded by the law. To such people you must be firm

- 12 -

and uncompromising. But remember that a "no" can be said courteously. A reasonable person will accept a reasonable answer and explanation. The few who may be momentarily offended usually will in the end come to understand that you were performing your duty as required by the law.

## BE FRANK

Caution should be exercised not to misinform anyone or to leave grounds for a wrong impression in any case; but should this occur, it is no sign of weakness to acknowledge the mistake. Not nearly so much prestige and self-respect will be lost in that way as by attempting to cover up an error.

## ACKNOWLEDGE APPRECIATION FOR ASSISTANCE GIVEN

Employees of this Service often will be assisted by members of the public or other agencies in a spirit of cooperation and helpfulness. You should never fail to acknowledge such assistance, even though it may prove to be of no value to the Service.

## COOPERATIVE SPIRIT AND LOYALTY TO THE SERVICE

Every employee of this Service has reason to be proud that he is so employed. The expected attitude of every employee is that of loyalty and helpful cooperation. There should exist a spirit of mutual helpfulness among all employees. Every possible aid should be given associates, especially information which may be of assistance to them. This policy of cooperative endeavor should also govern the relationship between employees of the Immigration and Naturalization Service and employees of other agencies upon whom this Service is often dependent for information and assistance.

Rumors about other employees should never be repeated. Critical or personal remarks should be avoided which might tend to cause ill feeling or rumors about other employees, the Service, our Government, the President of the United States, or the recognized political parties. Officers must refrain from criticizing, to the public, the laws which they are required to enforce but about which they may have personal contrary opinion.

- 13 -

# ABUSE OF AUTHORITY

Unfortunately there are some officers who erroneously think that their official position provides an immunity against the necessary requirement to conform with local laws. Such an attitude is undesirable and regrettable. The authority an officer may exercise is specified by law and the regulations of this Service. These bounds should not be transgressed, because it places an officer in a position where he has no legal rights and lays him and the Service open to serious criticism. Furthermore, it makes the offender subject to disciplinary action. Officers of this Service are members of the local community and as such are expected to conduct themselves as any other respectable citizen. They should never deviate from strict observance of city speed or parking laws except as absolutely required in the performance of their official duties. They must provide themselves with drivers' licenses in compliance with State and local laws.

## USE OF OFFICIAL POSITION FOR PERSONAL GAIN

The use of one's official position for personal gain such as free tickets, passes, etc. is reprehensible and, when known, will serve as the basis for disciplinary action against the offender.

## PERSONAL CONDUCT ON AND OFF DUTY

Although this Service has little control over the conduct of its employees when off duty, such conduct may become of direct and immediate concern to the Service. You are expected to obey the laws of our country and so far as possible, consistent with your official position, you should respect and endeavor to follow the customs of the community in which you are stationed. It behooves all Government employees, therefore, to behave themselves in such a manner that their conduct will be above reproach. Those who wish to be most respected in their own communities and who wish to progress in the Service will, as a guide to their conduct, ask themselves two questions, (1) "Will what I am about to do subject myself or the Service to adverse criticism?" and (2) "Will my conduct make me less able to do my job well when I return to duty?".

Elements of personal conduct on and off duty which might affect your performance of duty or the functioning of the Service are, of course, subject to Service regulations.

# INDEBTEDNESS

As a part of your obligation to conduct yourself so as to reflect favorably on the Service, you are expected to attend properly and promptly to your personal obligations.

## ASSOCIATIONS OF A QUESTIONABLE NATURE

Officers of this Service should conduct themselves at all times in such a manner as will reflect credit upon the Service. Illegal establishments and places held in disrepute should be entered only when official business requires it. Government officers, known as such to the public, who are seen to frequent such establishments degrade themselves and the Service in the popular esteem. Consorting with or being habitually seen in the company of questionable characters is considered improper conduct for officers of this Service. Officers should never enter public saloons for the purpose of drinking while in uniform, even at the end of the day's work. In other words, officers of this Service should avoid all associations or places which may degrade them or their positions in the eyes of the public.

## DEVOTION TO DUTY

The acid test of devotion to duty is found in what an employee does toward career advancement and sustained good work in addition to what is required of him to hold his job. Officers who are genuinely interested in their work strive to become more skilled and efficient in the performance of their duties. Self-improvement usually involves a sacrifice of time and extra effort. Keep well informed on changes in laws, rules and regulations applicable to Immigration and Naturalization matters. Officers should keep themselves informed as to current affairs. It is helpful to know the geography, history, and customs of countries from which aliens come to the United States, and from foreign countries to which they (the officers) may be assigned or detailed to perform their duties.

## PUNCTUALITY

Punctuality is important enough to be an absolute requirement. In addition, it is an excellent indication of an officer's devotion to duty. When an officer finds that he will not be able to report for duty, he should immediately report the fact and the reason, as provided by local rules.

# PERSONAL APPEARANCE

Employees who meet the public should be careful of their personal appearance. A good personal appearance adds to their prestige and is just as essential to an officer of this Service as tools are to a craftsman. Where a uniform is required, it should be complete in all details and devoid of ornaments which are not a part of the uniform. If the uniform is worn in public when off duty, it should be worn in its entirety. It hardly need be said that clothes or uniforms worn on duty should be kept clean, neat and well-pressed.

Extremes and fads in personal appearance and attire are prohibited in order to maintain the highest standards of propriety, decorum, and good taste, and to create the most favorable impression on the public.

The following grooming standards shall apply to all INS officers wearing a uniform, as required by Service regulation, except Contact Representatives, Port Receptionists and Immigration Judges. The officers shall be subject to these standards whether on regular or overtime duty, regardless of the activity he or she is performing. Wearing the uniform in all instances makes compliance with the following standards compulsory.

1. Hair

Hair will be kept in a neat, clean, and commonly acceptable style with the following restrictions, to be considered with the head held erect:

For males, the hair, when groomed for intended appearance, will not cover any portion of the ear, nor touch the shirt collar, nor cover any portion of the eyebrows. "Greasing" or "slicking" of the hair for the expressed purpose of accommodating these restrictions will not be acceptable. Moderate "natural" type haircuts are permitted if they qualify within the limits described above, provided they do not interfere with the wearing of required uniform headgear.

For females, the hair shall be worn in acceptable fashion, so that it does not extend below the outer portion of the shirt collar, nor completely cover the ear on the side, nor cover any portion of the eyebrows

to the front. The hair shall not interfere with the wearing of the required uniform headgear. While barrettes, pins, and combs may be worn, they may not be of a type which could reasonably be called "conspicuous" or dangerous to the wearer, or to other persons in the locality. For safety reasons, earrings, other than "button" or "post" type shall not be worn. Make-up or nail polish, if worn, shall be in accord with standards of "good taste", as opposed to "garish".

2. Sideburns

Sideburns will not extend below the bottom of the ear lobe and will end with a clean-shaven horizontal line. The maximum allowable width at the bottom of the sideburns shall be 1 1/2 inches. Sideburns shall be neatly trimmed and the maximum extension of the hair in the sideburns shall not exceed 1/2 inch.

3. Mustaches

Mustaches shall not extend more than 1/4 inch below a horizontal line through the corners of the mouth, nor below the vermillion border of the upper lip. Mustaches may not be heavily waxed or twisted and must be neatly trimmed.

4. Beards

Beards shall not be permitted except in cases where an employee, or applicant for employment, is a bona fide and practising member of a religious group which specifically prohibits the removal of hair from the face. Personnel with a medical condition which precludes shaving shall be required to present a written statement from a doctor verifying that such condition exists.

Grooming standards pertaining to employees who wear civilian attire will be set on a local basis by the appropriate District Director or Chief Patrol Agent.

Uniform articles will conform with published specifications and manufacturers recommendations as to cut, shape, and patterns. Civilian apparel will be limited to conservative business attire and shoes in keeping with such clothing, except for assignments that necessitate the wearing of other clothing to serve a specific purpose.

**OFFICER'S STATEMENT**

I have carefully read and studied the Officers' Handbook and will make its contents the basis for my conduct while a member of the Immigration and Naturalization Service.

Date _____

Signature _____

Title of Position _____

Official Station _____

(Please tear out this page and after filling out the information called for, return it to your supervisor. It will be kept in the Regional Office file in the case of a field employee and in the Central Office file in the case of a Central Office employee.)

*U.S. GOVERNMENT PRINTING OFFICE:1992  60071/1402M

UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
WASHINGTON, D.C.

OFFICERS' HANDBOOK

A Guide for Proper Conduct
and Relationships With Aliens
and the General Public

M-68
Rev. 1981N


EXHIBIT
3.

# FOREWORD

The Immigration and Naturalization Service has a tradition of good public service. Everyone who is employed in our Service is, in a general sense, a representative of the Service. We are proud to be a part of it. This pride is reflected in the degree of efficiency with which we go about our daily work and in the courtesy and effectiveness with which we deal with each member of the public with whom we come into official contact, as well as with our associates in the Service.

It is our purpose in this handbook to set forth the more important guides to proper official conduct in order to reduce to an absolute minimum occurrences of misconduct or impropriety on the part of members of the Service in their dealings with the public.

It obviously is impracticable to attempt to gather in one small handbook all the laws, regulations and standards of conduct applicable to our daily contacts with the public and our associates while we are on duty. Everyone is presumed to know the law. Service regulations are, of course, readily available to all of us and should be frequently consulted. Civil Service regulations can be made available through supervisors or the various personnel offices of the Service.

Compliance with the rules set forth in the pages which follow, and the exercise of reasonably sound judgment, will assist you in the proper discharge of your official duties.

# PART I.—LAWS AND REGULATIONS

## GENERAL STATEMENT

A brief summary of Federal laws and Service regulations is presented in this part.

## USE OF ALCOHOL & DRUGS

As an employer, the Federal Government is concerned with the accomplishment of agency missions and the requisite need to maintain employee productivity. When an employee's use of drugs or alcohol interferes with the efficient and safe performance of his or her assigned duties, reduces his or her dependability or reflects discredit on the agency, Federal managers will take action in the form of (1) nondisciplinary procedures under which an employee with a drinking or drug problem is offered rehabilitative assistance, and (2) failing response which results in acceptable work performance, invoking regular disciplinary procedures for dealing with problem employees.

A full statement of agency policy regarding employee use of drugs or alcohol is found in DOJ Order 1792.1 on the Employee Assistance Program. In brief, the following is stated: (1) Alcoholism and drug abuse are recognized as treatable health problems; (2) the agency is not concerned with the employee's use of alcohol except as it may affect job performance or the efficiency of the service; (3) an agency will not condone employee drug activity which is contrary to law; (4) employees who suspect an alcoholism or drug abuse problem are encouraged to voluntarily seek counseling; and (5) the counseling assistance will be handled in a confidential manner.

## DISCLOSURE OF CONFIDENTIAL INFORMATION

Official business with this Service, so far as possible consistent with the limitations of available space, should be conducted in offices out of the hearing of other aliens and the general public. Discussions

among officers involving points of law should be confined to groups composed only of officers and employees of this Service. Official matters should never be discussed with anyone outside the office except under proper authorization. Information contained in official files is strictly confidential and must be used only as authorized. Aliens under examination should not be informed of the source of confidential information nor should they be permitted to see the files or records of the Service except as provided under existing rules and regulations. If you are in doubt in any instance, consult your supervisor.

## ACCEPTANCE OF GRATUITIES

The acceptance of gratuities by officers of this Service or members of their families from any person or his agent who has any official matter before this Service is forbidden by Statute and by regulations. Acceptance of gratuities, however inconsequential, encourages requests for favors. It is easier to refuse an improper request when you are not obligated to the person who makes such a request. Refusal to accept gifts offered in good faith, however, must be done tactfully and courteously in order not to offend persons who offer such gratuities.

## CONFLICT OF INTEREST

Officers of this Service shall avoid involvement in any conflict of interest situation, i.e., one in which a private interest (usually of an economic nature) conflicts or raises a reasonable question of conflict with official duties and responsibilities. The potential conflict is of concern whether it is real or apparent.

## OUTSIDE EMPLOYMENT

An employee of this Service may not engage in any outside employment (including teaching, lecturing or writing), or in any business activity, without prior written approval. Authority will not be granted if the proposed employment or business activity might interfere with the employee's official duties, or involve or embarrass the Service in any way. Approval of such employment may be revoked at any time if circumstances warrant such action.

-2-

## ACTING AS AN ATTORNEY OR AGENT IN CLAIMS AGAINST THE UNITED STATES

No employee of the Immigration and Naturalization Service is permitted to act as an agent or attorney in prosecuting any claim against the United States by any means or manner other than in the discharge of his official duties, or to receive any gratuity or any share or interest in any claim from any claimant against the United States for any services rendered in the prosecution of such claim. No person who has been in the employ of this Service may take any action in the prosecution of any claim pending at the time he was an employee until he shall have been no longer connected with the government service for at least two years.

## FALSE CLAIMS AGAINST THE UNITED STATES

Severe penalties are provided by the United States criminal code for willfully making or presenting a false, fictitious or fraudulent claim for the purpose of defrauding the government. False or inaccurate statements as to travel performed, work done, or amounts expended are grounds for dismissal from the Service and possible criminal prosecution.

## FALSE STATEMENT OF AN OFFICER CONCERNING OATH TAKEN BEFORE HIM

Any officer of this Service authorized to administer oaths or to take and certify acknowledgments is liable to criminal prosecution for knowingly making any false acknowledgment, certificate, or statement concerning an appearance before him.

## CONSPIRACY

The United States Criminal Code provides very severe penalties, upon conviction, when two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose and one or more of the parties do any act to effect the object of the conspiracy.

-3-

# CODE OF ETHICS FOR GOVERNMENT SERVICE

ANY PERSON IN GOVERNMENT SERVICE SHOULD:

PUT loyalty to the highest moral principles and to country above loyalty to persons, party, or Government department.

UPHOLD the Constitution, laws and legal regulations of the United States and all governments therein and never be a party to their evasion.

GIVE a full day's labor for a full day's pay; giving to the performance of his duties his earnest effort and best thought.

SEEK to find and employ more efficient and economical ways of getting tasks accomplished.

NEVER discriminate unfairly by the dispensing of special favors or privileges to anyone, whether for remuneration or not; and never accept, for himself or his family, favors or benefits under circumstances which might be construed by reasonable persons as influencing the performance of his governmental duties.

MAKE no private promises of any kind binding upon the duties of office, since a Government employee has no private word which can be binding of public duty.

ENGAGE in no business with Government, either directly or indirectly, which is inconsistent with the conscientious performance of his governmental duties.

NEVER use any information coming to him confidentially in the performance of governmental duties as a means of making private profit.

EXPOSE corruption wherever discovered.

UPHOLD these principles, ever conscious that public office is a public trust.

# PART II--SERVICE STANDARDS

## GENERAL STATEMENT

The following Service standards have been designed to assist you in avoiding pitfalls which others have found to lead to embarrassment and other more serious consequences. They provide criteria for objective, self-analysis which will serve as a basis for constructive, planned self-improvement. Even though a violation of these standards may appear to be less serious than a violation of law or regulation, it is an important factor in appraising an officer's performance.

Most reprimands become necessary, not as a result of any lack of skill or knowledge of duties, but because of conditions which never would have occurred if reasonably good judgment had been exercised. Personality traits and general conduct both on and off duty are too often underestimated and neglected factors in success.

## PROPER IDENTIFICATION

Officers must identify themselves properly when conducting official business. *In identifying themselves they should show their credentials and make it plain to those with whom they are dealing that they are members of the Immigration and Naturalization Service.* If reference is merely made to the Department of Justice they may be confused with representatives of other branches of the Department. All officers are cautioned that they are not to conduct themselves in any manner, by word or deed, so as to give the impression that they are connected with any other government agency.

## NEEDLESS DISPLAY OF OFFICIAL MEANS OF IDENTIFICATION

Indiscriminate use of official certificates or official titles for other than official purposes or the needless display of firearms is not authorized and may serve as a basis for disciplinary action against the offender.

## LOSS OF OFFICIAL BADGES OR CREDENTIALS

You are charged with the responsibility of maintaining official identification credentials in good condition, free from undue wear and mutilation. If you should lose your official badge, credentials or other government property with which you are charged, you shall *immediately* report the fact, in writing, to your official superior, stating the circumstances under which the loss occurred. If the facts reasonably establish that the loss occurred through negligence or carelessness, such disciplinary action will be taken as the facts and circumstances surrounding the loss may warrant. Failure to report such a loss may also result in disciplinary action.

## PROPER USE OF GOVERNMENT PROPERTY AND GOVERNMENT TIME

The utmost care should be exercised by officers of this Service in the use of automobiles or other Government property. Carrying unauthorized passengers in official automobiles is generally prohibited. The hours of duty specified is time to be devoted to Government business. Personal affairs must not be conducted on Government time. Unauthorized use of Government property may serve as a basis for disciplinary action.

## PROPER USE OF FIREARMS

Firearms shall be employed under the following conditions only: In self-defense, in defense of another officer, or in the defense of an innocent third party. Firearms shall not be used to fire into the air or alongside an alien who is attempting to escape. A misaimed bullet may mean manslaughter. The firing of warning shots in any manner is prohibited.

## RELATIONSHIPS WITH ALIENS

Aliens appear at Immigration and Naturalization Offices because they have problems. Those problems are real and important to them, no matter how insignificant they may appear to you. It is your duty to give them the same treatment you would like if your situations were reversed. An arrogant or unpleasant manner in official relationships will not be tolerated. Aliens are entitled to certain rights, among which is

-6-

the right to courteous, considerate treatment by officers of this Service. No remarks of a sarcastic or "kidding" nature should ever be made to an alien about his name, his nationality, his race, his religion, his economic condition, his dress, etc. Such remarks may result in disciplinary action against the employee involved. A pleasant conversational tone of voice should be used in speaking unless the person addressed is hard of hearing. A loud voice does not make a situation more clear to a person who has a poor command of English; rather, it may cause him to become confused.

Any association, business, social or otherwise, which may obligate, or appear to obligate, you to an alien in any way should be carefully avoided. Such obligation can become a serious barrier to the proper enforcement of the law and may bring criticism both to you and to the Service. You should never promise aliens immunity from deportation or prosecution for the purpose of obtaining information concerning other aliens or law violators. It is not good general practice to make promises of any kind to aliens, and certainly promises that cannot be fulfilled should not be made. Some practices which are not wrong in themselves should be avoided because of the improper impressions they create. For example: you should not authorize an alien to use your name as a business reference nor should you accept any kind of office, honorary or otherwise, in an organization whose membership is composed primarily of aliens and which might by implication place you in the position of being indebted to the group. You are likewise warned to avoid familiarity or personal relationships with aliens detained by the Service or who may possibly have business with the Service. Needless to say, "dates" should never be made with such aliens of the opposite sex.

Business dealings of any nature between you and an alien who is detained by this Service are forbidden. All dealings with alien merchants and other alien business people should be on a strictly business basis, and full value should be paid for goods received or services rendered. You should never buy property or personal effects from an alien who is under deportation proceedings or who has been excluded from admission to the United States. If, prior to your employment by this Service, you had business dealings with an alien who appears before you, the case should be referred to another officer.

-7-

## HUMANIZING IMMIGRATION AND NATURALIZATION LAWS

Immigration laws may appear to work hardships on aliens. You can humanize these laws while at the same time carry out the intent of Congress and the will of the people. You should always keep in mind that your decisions may spell future happiness or sorrow for those affected by your decisions. If it becomes necessary to detain or exclude an alien, even this can be done in a considerate manner. At a port of entry the Immigration Inspector is usually the first representative of our Government whom the alien meets. An unfavorable impression gained at this time will likely be a lasting one. We owe it to ourselves, the Service, and to our country to make this impression as favorable as possible. Deportation should be effected with as much consideration and humane treatment as possible. In such cases, under proper safeguards, the deportee should be permitted to say goodbye to his relatives and to collect the wages due him, and should be given any other reasonable assistance. He should be permitted to collect his personal belongings and to take them with him, no matter how trivial the articles may seem to you. Property which seems to have little utility may have subjective value that an officer may not realize. Adequate care must always be taken to insure that property held in custody of this Service is properly safeguarded against loss, theft, etc., and that it is delivered to the alien when he is deported from the United States, or released from custody.

## PREJUDICIAL INFLUENCE IN ADMINISTERING THE IMMIGRATION AND NATURALIZATION LAWS

Another abuse of authority of which no officer should ever be guilty is the use of unfair discrimination in the administration of the Immigration and Naturalization Laws. Any suggestion by an officer to an outsider or concerned persons that he can influence the decision in any case will be cause for disciplinary action. Certain rights and privileges to which aliens are entitled are provided by law. It is the duty of each officer individually to insure that these rights and privileges are administered with justice and equality. Discretionary action permitted under the Immigration and Naturalization Laws is intended to be nondiscriminatory. The intended purpose of such discretionary action is defeated if Service officers are guided by their own biases and prejudices. In all cases, care must be taken not to discriminate in favor of or against any alien or class of aliens.

## PREMATURE DECISIONS

You should take care to avoid giving inaccurate information to the public or to render opinions when not in possession of all of the facts. The premature expression of decisions is likely to prove a source of disappointment and embarrassment to all concerned and if wrong, may impel you to resort to undesirable face-saving devices. (Example: Advising an alien under deportation proceeding to dispose of household goods or personal effects in anticipation of possible deportation may prove embarrassing to you and cause needless difficulties to the alien should deportation not be ordered.) Premature decisions, whether verbally expressed or held in abeyance, are barriers to the unbiased investigation and consideration of evidence. A preconceived notion of guilt or innocence in any case introduces a conditioning and selective factor in the mind of the officer which may go far to preclude the true administration of justice. Inform aliens under proceedings as to decisions in their cases when all the facts are in, and after they have been duly considered, in such manner as to satisfy the aliens, if possible, that their cases have been decided only after fair consideration of all the available facts.

## SOLICITATION OF SERVICES

An alien who is detained or an alien or other person who has official business with the Service may ask you whether it is necessary or desirable to seek the services of an attorney or other representative. In no case should he be informed that he should not obtain an attorney. The person making such inquiry should be informed that he has the right to be represented at his own expense by an attorney in proceedings before the Service. However, he should also be informed that the determination whether he should obtain an attorney is one that he must make himself and that Service employees may not make such determination for him. If such a person states he would like to be represented by an attorney but that he cannot afford the expense involved, he may be referred to a voluntary social agency or a legal aid organization or a Bar Association.

Also you may be requested to suggest the name of an attorney or bonding company. A person requesting the name of an attorney should be referred to a Bar Association or to a telephone directory which lists

the names and addresses of attorneys. A person requesting the name of a bonding company should be referred to a telephone directory which lists the names of bonding companies. In no instance should a person be referred to a specific attorney or firm.

## DISCUSSION OF PERSONAL MATTERS WITH ALIENS

Discussion of matters personal to an alien or to an officer is out of order in official business relationships unless such personal matters are pertinent to the case. Such is usually a waste of time and frequently leads to objectionable discussion and consequent embarrassment.

## APPROVED TECHNIQUES FOR QUESTIONING ALIENS

An alien should always be fully informed of his rights. In the actual interrogation of the alien you should have a definite objective in mind and a purpose for every question. Such a procedure will save time, conserve energy, and inspire the respect of the alien and any other persons who may be present. Needless conversation wastes time, lessens respect for the officer, and may lead to serious antagonism and verbal controversy. Avoid following a certain line of questioning without taking into consideration the alien's age, intelligence, educational background and knowledge of the English language. As much privacy as possible should always be accorded an alien when he is being questioned in other than routine matters. It is poor procedure to question several offenders in the presence of each other. Avoid questioning of women on personal matters in the presence of others when it is likely to cause embarrassment, either to her or to anyone else present. When questioning a woman behind closed doors, a witness should be present for the protection of the officer, the Government, and the woman. When interrogating an alien, especially a woman, concerning apparent marital misconduct, nothing should be assumed beyond what the facts at hand reasonably well establish. Ground work should be carefully planned to make the questions appear justified to the person concerned. Questions on sordid subjects should be couched in non-offensive terms and phrased in such a way as to elicit the desired information. Such questions should not contain implications not supported by evidence. Before questioning an alien in such cases it is well to analyze carefully the facts and state the questions in such a manner that you yourself, if you were on the receiving end, would not be offended by their tenor.

## USE OF PHYSICAL FORCE AND "THIRD DEGREE METHODS"

The use of physical force or violence in handling detained aliens or other persons with whom official business is being conducted is permissible only in self-defense, in defense of another person, or to such an extent as is absolutely necessary in making an arrest or preventing an escape. The use of force and "third degree methods" to obtain information and to force confessions will not be tolerated. Abuse of aliens is not permitted. There are times when aliens must be handcuffed, but in such cases the aliens should not be exposed to the public view any more than is necessary. Every effort should be made to spare an alien unnecessary embarrassment in his relations with the Service.

## ESCAPE OF AN ALIEN

Officers charged with the responsibility of escorting aliens in the custody of the Service are expected to take every reasonable precaution to prevent their escape. When an escape does occur a complete report should be made immediately thereafter. Appraisal of the facts and circumstances surrounding the escape will be made and disciplinary action taken when the facts justify it.

## RELATIONSHIPS WITH THE PUBLIC

The standing of the Immigration and Naturalization Service is largely dependent upon the service it renders, its effectiveness in enforcing the laws it is charged with administering and the general impression its employees make on the public. As an employee of the Government and the Immigration and Naturalization Service it is your duty to serve the public in a fair and impartial manner. We are dependent upon the law-abiding public for a constant flow of valuable information to assist us in the discharge of our functions. Officers of this Service must keep in mind that they are specialists; that what is common knowledge to them is not equally known to all, and that it is their duty to endeavor to acquaint persons thoroughly with laws and regulations about which they inquire and to direct them to such other sources of information as they may request and to which they have a right. Every member of the public is entitled, as an absolute right, to courteous, fair, impartial, and sympathetic treatment from every employee of this Service.

## ADMINISTRATION OF OATHS

Where an oath is required, it should be administered in such a way as to impress the person taking it with its seriousness. It should never be administered in a perfunctory manner. Oaths should never be administered over the telephone, or to a person while he is seated.

## POISE AND DIGNITY IN PERFORMANCE OF OFFICIAL DUTIES

The importance of poise, dignity, sympathy, honest simplicity, and self-control even under the most severe provocation cannot be over-emphasized. The technique of reversing the situation to determine how it looks from the other man's point of view should be used extensively. An officer should be sure of himself but should never try to unduly impress others with his knowledge. He should be businesslike and considerate but never condescending or officious in this demeanor. He should cultivate the use of good English. He should never use profanity or vulgarity.

## COURTESY

The Service takes the realistic view that courtesy is necessary in our activities and is almost as much a job requirement as any other. It is your duty to be considerate and polite to the public at all times.

## BE PATIENT

It is often difficult to be patient and to exercise self-restraint in the face of verbal criticism or threatened physical violence, but such restraint and patience usually will enlist the support of witnesses and pay dividends in increased respect for the individual and the Service. Officers of this Service have the difficult problem of dealing with persons of a wide range of intelligence, mood, temperament and cultural backgrounds. No matter how exasperating the circumstances become, you must bear in mind that you are a representative of our Government and you must conduct yourself in a worthy manner.

## BE FIRM

There always are people who will insist on special favors and privileges not accorded by the law. To such people you must be firm

and uncompromising. But remember that a "no" can be said courteously. A reasonable person will accept a reasonable answer and explanation. The few who may be momentarily offended usually will in the end come to understand that you were performing your duty as required by the law.

## BE FRANK

Caution should be exercised not to misinform anyone or to leave grounds for a wrong impression in any case; but should this occur, it is no sign of weakness to acknowledge the mistake. Not nearly so much prestige and self-respect will be lost in that way as by attempting to cover up an error.

## ACKNOWLEDGE APPRECIATION FOR ASSISTANCE GIVEN

Employees of this Service often will be assisted by members of the public or other agencies in a spirit of cooperation and helpfulness. You should never fail to acknowledge such assistance, even though it may prove to be of no value to the Service.

## COOPERATIVE SPIRIT AND LOYALTY TO THE SERVICE

Every employee of this Service has reason to be proud that he is so employed. The expected attitude of every employee is that of loyalty and helpful cooperation. There should exist a spirit of mutual helpfulness among all employees. Every possible aid should be given associates, especially information which may be of assistance to them. This policy of cooperative endeavor should also govern the relationship between employees of the Immigration and Naturalization Service and employees of other agencies upon whom this Service is often dependent for information and assistance.

Rumors about other employees should never be repeated. Critical or personal remarks should be avoided which might tend to cause ill feeling or rumors about other employees, the Service, our Government, the President of the United States, or the recognized political parties. Officers must refrain from criticizing, to the public, the laws which they are required to enforce but about which they may have personal contrary opinion.

# ABUSE OF AUTHORITY

Unfortunately there are some officers who erroneously think that their official position provides an immunity against the necessary requirement to conform with local laws. Such an attitude is undesirable and regrettable. The authority an officer may exercise is specified by law and the regulations of this Service. These bounds should not be transgressed, because it places an officer in a position where he has no legal rights and lays him and the Service open to serious criticism. Furthermore, it makes the offender subject to disciplinary action. Officers of this Service are members of the local community and as such are expected to conduct themselves as any other respectable citizen. They should never deviate from strict observance of city speed or parking laws except as absolutely required in the performance of their official duties. They must provide themselves with drivers' licenses in compliance with State and local laws.

# USE OF OFFICIAL POSITION FOR PERSONAL GAIN

The use of one's official position for personal gains such as free tickets, passes, etc. is reprehensible and, when known, will serve as the basis for disciplinary action against the offender.

# PERSONAL CONDUCT ON AND OFF DUTY

Although this Service has little control over the conduct of its employees when off duty, such conduct may become of direct and immediate concern to the Service. You are expected to obey the laws of our country and so far as possible, consistent with your official position, you should respect and endeavor to follow the customs of the community in which you are stationed. It behooves all Government employees, therefore, to behave themselves in such a manner that their conduct will be above reproach. Those who wish to be most respected in their own communities and who wish to progress in the Service will, as a guide to their conduct, ask themselves two questions, (1) "Will what I am about to do subject myself or the Service to adverse criticism?" and (2) "Will my conduct make me less able to do my job well when I return to duty?".

Elements of personal conduct on and off duty which might affect your performance of duty or the functioning of the Service are, of course, subject to Service regulations.

# INDEBTEDNESS

As a part of your obligation to conduct yourself so as to reflect favorably on the Service, you are expected to attend properly and promptly to your personal obligations.

# ASSOCIATIONS OF A QUESTIONABLE NATURE

Officers of this Service should conduct themselves at all times in such a manner as will reflect credit upon the Service. Illegal establishments and places held in disrepute should be entered only when official business requires it. Government officers, known as such to the public, who are seen to frequent such establishments degrade themselves and the Service in the popular esteem. Consorting with or being habitually seen in the company of questionable characters is considered improper conduct for officers of this Service. Officers should never enter public saloons for the purpose of drinking while in uniform, even at the end of the day's work. In other words, officers of this Service should avoid all associations or places which may degrade them or their positions in the eyes of the public.

# DEVOTION TO DUTY

The acid test of devotion to duty is found in what an employee does toward career advancement and sustained good work in addition to what is required of him to hold his job. Officers who are genuinely interested in their work strive to become more skilled and efficient in the performance of their duties. Self-improvement usually involves a sacrifice of time and extra effort. Keep well informed on changes in laws, rules and regulations applicable to Immigration and Naturalization matters. Officers should keep themselves informed as to current affairs. It is helpful to know the geography, history, and customs of countries from which aliens come to the United States, and from foreign countries to which they (the officers) may be assigned or detailed to perform their duties.

# PUNCTUALITY

Punctuality is important enough to be an absolute requirement. In addition, it is an excellent indication of an officer's devotion to duty. When an officer finds that he will not be able to report for duty, he should immediately report the fact and the reason, as provided by local rules.

## PERSONAL APPEARANCE

Employees who meet the public should be careful of their personal appearance. A good personal appearance adds to their prestige and is just as essential to an officer of this Service as tools are to a craftsman. Where a uniform is required, it should be complete in all details and devoid of ornaments which are not a part of the uniform. If the uniform is worn in public when off duty, it should be worn in its entirety. It hardly need be said that clothes or uniforms worn on duty should be kept clean, neat and well-pressed.

Extremes and fads in personal appearance and attire are prohibited in order to maintain the highest standards of propriety, decorum, and good taste, and to create the most favorable impression on the public.

The following grooming standards shall apply to all INS officers wearing a uniform, as required by Service regulation, except Contact Representatives, Port Receptionists and Immigration Judges. The officers shall be subject to these standards whether on regular or overtime duty, regardless of the activity he or she is performing. Wearing the uniform in all instances makes compliance with the following standards compulsory.

1.  Hair

Hair will be kept in a neat, clean, and commonly acceptable style with the following restrictions, to be considered with the head held erect:

For males, the hair, when groomed for intended appearance, will not cover any portion of the ear, nor touch the shirt collar, nor cover any portion of the eyebrows. "Greasing" or "slicking" of the hair for the expressed purpose of accommodating these restrictions will not be acceptable. Moderate "natural" type haircuts are permitted if they qualify within the limits described above, provided they do not interfere with the wearing of required uniform headgear.

For females, the hair shall be worn in acceptable fashion, so that it does not extend below the outer portion of the shirt collar, nor completely cover the ear on the side, nor cover any portion of the eyebrows

- 16 -

to the front. The hair shall not interfere with the wearing of the required uniform headgear. While barrettes, pins, and combs may be worn, they may not be of a type which could reasonably be called "conspicuous" or dangerous to the wearer, or to other persons in the locality. For safety reasons, earrings, other than "button" or "post" type shall not be worn. Make-up or nail polish, if worn, shall be in accord with standards of "good taste", as opposed to "garish".

2.  Sideburns

Sideburns will not extend below the bottom of the ear lobe and will end with a clean-shaven horizontal line. The maximum allowable width at the bottom of the sideburns shall be 1 1/2 inches. Sideburns shall be neatly trimmed and the maximum extension of the hair in the sideburns shall not exceed 1/2 inch.

3.  Mustaches

Mustaches shall not extend more than 1/4 inch below a horizontal line through the corners of the mouth, nor below the vermillion border of the upper lip. Mustaches may not be heavily waxed or twisted and must be neatly trimmed.

4.  Beards

Beards shall not be permitted except in cases where an employee, or applicant for employment, is a bona fide and practicing member of a religious group which specifically prohibits the removal of hair from the face. Personnel with a medical condition which precludes shaving shall be required to present a written statement from a doctor verifying that such condition exists.

Grooming standards pertaining to employees who wear civilian attire will be set on a local basis by the appropriate District Director or Chief Patrol Agent.

Uniform articles will conform with published specifications and manufacturers recommendations as to cut, shape, and patterns. Civilian apparel will be limited to conservative business attire and shoes in keeping with such clothing, except for assignments that necessitate the wearing of other clothing to serve a specific purpose.

-17-

## OFFICER'S STATEMENT

Date _____

I have carefully read and studied the Officers' Handbook and will make its contents the basis for my conduct while a member of the Immigration and Naturalization Service.

Signature _____

Title of Position _____

Official Station _____

(Please tear out this page and after filling out the information called for, return it to your supervisor. It will be kept in the Regional Office file in the case of a field employee and in the Central Office file in the case of a Central Office employee.)

*U.S. GOVERNMENT PRINTING OFFICE:1992 60071/I1402M

CERTIFICATION OF VITAL RECORD

# City of Brownsville, Texas
## The Office of the City Secretary

STATE OF TEXAS — CERTIFICATE OF DEATH — STATE FILE NUMBER

*Texas Department of Health — Bureau of Vital Statistics*

| 1. NAME OF DECEASED (a) FIRST | (b) MIDDLE | (c) LAST | (d) MAIDEN | 2. SEX | 3. DATE OF DEATH |
|---|---|---|---|---|---|
| GLEN | | COOKE | | MALE | APRIL 18, 1998 |

| 4. DATE OF BIRTH | 5. AGE (In Years) 29 | IF UNDER 1 YR. MO / DAYS / HOURS | IF UNDER 1 DAY MIN. | 6. BIRTH PLACE (CITY & STATE OR FOREIGN COUNTRY) | 7. SOCIAL SECURITY NO. |
|---|---|---|---|---|---|
| MAY 24, 1968 | 29 | | | BROWNSVILLE, TEXAS | 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 |

| 8. RACE | 9a. WAS THE DECEDENT OF HISPANIC ORIGIN? | 9b. IF YES, SPECIFY MEXICAN, CUBAN, PUERTO RICAN, ETC. | 10 WAS DECEDENT EVER IN U.S. ARMED FORCES? | 11. EDUCATION (SPECIFY HIGHEST GRADE COMPLETED, ELEM. OR SECONDARY (0-12) COLLEGE (13-16, 17+) |
|---|---|---|---|---|
| CAUCASIAN | ☐ YES ☒ NO | | ☐ YES ☒ NO | 12 |

| 12. MARITAL STATUS | 13. SURVIVING SPOUSE (IF WIFE, GIVE MAIDEN NAME) | 14a. DECEDENT'S USUAL OCCUPATION | 14b. KIND OF BUSINESS OR INDUSTRY |
|---|---|---|---|
| ☐ MARRIED ☐ NEVER MARRIED ☐ WIDOWED ☒ DIVORCED | | SELF-EMPLOYED | PRESSURE WASHING |

| 15a. RESIDENCE STREET ADDRESS | 15b. CITY OR TOWN |
|---|---|
| 28 WARREN AVE. | BROWNSVILLE |

| 15c. COUNTY | 15d. STATE | 15e. ZIP CODE | 15f. INSIDE CITY LIMITS |
|---|---|---|---|
| CAMERON | TEXAS | 78520 | ☒ YES ☐ NO |

| 16. FATHER'S NAME | 17. MOTHER'S MAIDEN NAME |
|---|---|
| CHESTER JOHN COOKE | MARIA TREJO |

18. PLACE OF DEATH (CHECK ONLY ONE)

HOSPITAL: ☐ INPATIENT ☒ ER/OUTPATIENT ☐ DOA    OTHER: ☐ NURSING HOME ☐ RESIDENCE ☐ OTHER (SPECIFY)

| 19. COUNTY OF DEATH | 20. CITY OR TOWN (IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO.) | 21. NAME OF HOSPITAL OR INSTITUTION (If not in institution, show street address) |
|---|---|---|
| CAMERON | BROWNSVILLE | BROWNSVILLE MEDICAL CENTER |

| 22. INFORMANT – SIGNATURE & RELATIONSHIP | 23. MAILING ADDRESS OF INFORMANT |
|---|---|
| Jacqueline Cooke (SISTER) | 28 WARREN AVE. BROWNSVILLE, TX 78520. |

| 24. METHOD OF DISPOSITION | 25a. PLACE OF DISPOSITION (NAME OF CEMETERY, CREMATORY OR OTHER PLACE) | 29. NAME & ADDRESS OF FUNERAL HOME |
|---|---|---|
| ☒ BURIAL ☐ CREMATION ☐ REMOVAL FROM STATE ☐ DONATION ☐ OTHER (SPECIFY) | ROSELAWN MEMORIAL GARDENS  Section 0  Block 205 | DARLING-MOUSER FUNERAL HOME 945 PALM BLVD BROWNSVILLE, TEXAS 78520. |

| 26. LOCATION (CITY, STATE) | |
|---|---|
| BROWNSVILLE, TEXAS | |

27. SIGNATURE OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH — OSCAR ALVAREZ 12150 — APRIL 21, 1998

28. CERTIFIER

☐ CERTIFYING PHYSICIAN — TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE TIME, DATE, PLACE, AND DUE TO THE CAUSE(S) AND MANNER AS STATED.

☐ MEDICAL EXAMINER — ON THE BASIS OF EXAMINATION AND/OR INVESTIGATION, IN MY OPINION, DEATH OCCURRED AT THE TIME, DATE, PLACE, AND DUE TO THE

☒ JUSTICE OF THE PEACE — CAUSE(S) AND MANNER AS STATED.

| 31. SIGNATURE & TITLE OF CERTIFIER | 32. DATE SIGNED | 33. TIME OF DEATH |
|---|---|---|
| Justice of the Peace | 5 / 23 / 98 | 7:54 P.M. |

34. PRINTED NAME & ADDRESS OF CERTIFIER

TONY TORRES J.P. 974 E. HARRISON BROWNSVILLE, TEXAS 78520

| 35. PART 1 — ENTER THE DISEASES, INJURIES OR COMPLICATIONS THAT CAUSED THE DEATH. DO NOT ENTER THE MODE OF DYING SUCH AS CARDIAC OR RESPIRATORY ARREST, SHOCK, OR HEART FAILURE. LIST ONLY ONE CAUSE ON EACH LINE. | Approximate Interval Between Onset and Death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) — MULTIPLE GUNSHOT WOUNDS. DUE TO (OR AS A LIKELY CONSEQUENCE OF): | Unknown |
| Sequentially list conditions, if any, leading to immediate cause. Enter UNDERLYING CAUSE (disease or injury that initiated events resulting in death) LAST — TWO PENETRATING GUNSHOT WOUNDS TO THE BACK. DUE TO (OR AS A LIKELY CONSEQUENCE OF): PENETRATING GUNSHOT WOUND TO LEFT ABDOMEN. DUE TO (OR AS A LIKELY CONSEQUENCE OF): GUNSHOT WOUNDS TO ABDOMEN: MASSIVE LETHAL HEMORRHAGE WITH IRREVERSIBLE SHOCK. | |

| PART 2 — OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART 1 (i.e., substance abuse, diabetes, smoking, etc.) | 36a. AUTOPSY? | 36b. AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? |
|---|---|---|
| | ☒ YES ☐ NO | ☐ YES ☒ NO |

| 37. DID TOBACCO USE CONTRIBUTE TO DEATH | 38. DID ALCOHOL USE CONTRIBUTE TO DEATH | 39. WAS DECEDENT PREGNANT |
|---|---|---|
| ☐ YES ☐ PROBABLY ☐ NO ☒ UNKNOWN | ☒ YES ☐ PROBABLY ☐ NO ☐ UNKNOWN | AT TIME OF DEATH ☐ YES ☒ NO ☐ UNK  WITHIN LAST 12 MO ☐ YES ☒ NO ☐ UNK |

| 40. MANNER OF DEATH | 41a. DATE OF INJURY | 41b. TIME OF INJURY | 41c. INJURY AT WORK | 41d. PLACE OF INJURY – AT HOME, FARM, STREET, FACTORY, OFFICE, ETC. (SPECIFY) |
|---|---|---|---|---|
| ☐ NATURAL ☐ ACCIDENT ☐ SUICIDE ☒ HOMICIDE ☐ PENDING INVESTIGATION ☐ COULD NOT BE DETERMINED | 4-18-98 | 6:45 P.M. | ☐ YES ☒ NO | ALLEY |

| 41e. LOCATION (STREET AND NUMBER, CITY OR TOWN, STATE) |
|---|
| 1924 W. MONROE STREET / BROWNSVILLE, TEXAS 78520 |

| 41f. DESCRIBE HOW INJURY OCCURRED |
|---|
| MULTIPLE GUNSHOT WOUNDS. |

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. SIGNATURE OF LOCAL REGISTRAR |
|---|---|---|
| 02-0406-98 | 06-25-1998 | Melissa Dennany Morales, City Secretary |

S35279    Volume 32 Page 204

CERTIFIED COPY OF VITAL RECORDS

DATE ISSUED    03 25 98

STATE OF TEXAS
COUNTY OF CAMERON
...is is a true reproduction of the document officially registered and recorded on file in ...e Office of the City Secretary, City of Brownsville, Texas.

By: _____ Deputy    Norma Sleyn

Do not accept unless prepared on security paper with engraved border displaying the raised City of Brownsville seal.

Melissa Dennany Morales
City Secretary/Local Registrar

WARNING: The penalty for knowingly making a false statement in this form can be 2-10 yrs in prison and a fine of up to $10,000. (Health and Safety Code, Sec. 195.1, 1989)

VS-112 REV. 9/95



EXHIBIT 4